```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION
```

SYNERGETICS, INC.,              )
                                )
            Plaintiff,          )
                                )
      v.                        )      No. 4:04 CV 318 DDN
                                )
CHARLES RICHARD HURST, JR., and )
MICHAEL McGOWAN,                )
                                )
            Defendants.         )

## MEMORANDUM

This matter is before the court (1) for the entry of judgment following the return of the special verdict of the jury;[1] (2) the proposed judgment and the motion for remittitur filed by defendants (Doc. 198); and (3) the memorandum of plaintiff regarding the entry of judgment (Doc. 200).

In this action plaintiff Synergetics, Inc., alleged that defendants Charles Richard Hurst, Jr., and Michael McGowan (a) misappropriated plaintiff's trade secret business information, (b) interfered with plaintiff's business relationships with its customers, (c) breached their confidentiality agreements with plaintiff, and (d) violated a fiduciary duty of loyalty owed to plaintiff, when it was their employer. The court has subject matter jurisdiction over this removed action, because of the diversity of the citizenship of the parties and the amount in controversy. 28 U.S.C. §§ 1332, 1441. It is undisputed that the court must look to the substantive law of Missouri for the rules of decision in this action. Donovan v. Harrah's Maryland Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002).

### Findings of fact made by the jury

The jury returned its findings in the form of a special verdict in favor of plaintiff, finding the following facts:

---

[1]Following the publishing and the filing of the jury's special findings, the court gave the parties a period of time to advise it on the appropriate judgment to be entered.

1. On the claim of trade secret misappropriation, both defendants Hurst and McGowan misappropriated plaintiff's trade secrets regarding its pricing and product selections, its sales data, its prioritization of products, and the inner workings (tolerances and torque specifications) of its IRIS adapter. The jury found that plaintiff suffered harm as a direct result of the defendants' trade secret misappropriation.

2. Regarding plaintiff's claim for intentional interference with plaintiff's business relationships, defendants Hurst and McGowan each knew of and each intentionally interfered with plaintiff's business relationships with 13 of plaintiff's customers, doctors and hospitals.[2] The jury found that defendants intentionally used with or disclosed to plaintiff's customers trade secret information or information protected by defendants' confidentiality agreements with plaintiff, and that as a direct result of this interference plaintiff was damaged.

3. Regarding the claim for breach of contract, each defendant entered a confidentiality agreement with plaintiff whereby each agreed not to disclose or use confidential information about plaintiff or its customers; plaintiff performed its promises; each defendant breached his

---

[2] The jury identified the following subjects of defendant Hurst's interference: (a) Amarillo Cataract and Eye Surgery Center, (b) Danbury Hospital, (c) Dean Health Systems, (d) Gramercy Outpatient Surgery Center, (e) Harris County Hospital (Ben Taub General Hospital), (f) Health South Surgical Center of Dallas, (g) Methodist Ambulatory Surgical Hospital, (h) Presbyterian Hospital of Dallas, (i) St. Luke's Roosevelt, (j) Arlington Memorial Hospital, (k) Charles Mango, M.D. (Eye Consultants of Syracuse), (l) Retina and Vitreous of Texas, and (m) Ronan O'Malley, M.D.

The jury also identified the following subjects of defendant McGowan's interference, some of whom are different than those dealt with by Hurst: (a) Bascom Palmer Eye Institute, (b) Clara Maass Hospital, (c) Johns Hopkins, (d) Manhattan Eye, Ear and Throat, (e) Maria Berrocal, M.D., (f) New York Eye and Ear, (g) St. Luke's Roosevelt, (h) Thomas Jefferson University Hospital, (i) Wills Eye Surgery Center, (j) Yale Fisher, M.D., (k) Charles Mango, M.D. (Eye Consultants of Syracuse), (l) Retinal Research Center, New York, and (m) Ronan O'Malley, M.D.

agreement; and as a direct result of defendants' actions plaintiff was damaged.

  4. On the claim for breach of the fiduciary duty of loyalty, both defendants were employed by plaintiff in positions in which they were entrusted with trade secret information or confidential information belonging to plaintiff for employment purposes; each defendant acted in direct competition with plaintiff while still employed by plaintiff; and as a direct result of defendants' actions plaintiff was damaged.

  5. The jury awarded plaintiff actual damages in the sum of $1,759,165.

  6. By clear and convincing evidence, the conduct of each of the defendants was outrageous because each defendant had an evil motive or acted with reckless indifference to plaintiff's rights. The jury determined that each defendant is to pay plaintiff as punitive damages the separate sum of $293,194.16, which the jury described as "legal fees."[3]

## **Defendants' Motion Regarding Damages**

Defendants argue that the jury's awards of actual and punitive damages are excessive and not supported by the evidence. The court disagrees. Substantial evidence supports the jury's findings.

The evidence adduced at trial, consistent with the jury's findings, indicates the following facts. Only four companies[4] make and market a unit that generates a laser light which eye surgeons use during intra-ocular surgery. One of these companies, the Iris Laser Lightsource

---

[3] The jury originally awarded plaintiff punitive damages from each defendant in non-monetary terms ("half of [plaintiff's] legal fees"). Before the jury was discharged, at the sidebar, counsel for all parties asked that the issue of punitive damages be resubmitted to the jury, which the court did. After redeliberating, the jury returned the following verdicts of punitive damages against each defendant: "Legal fees of $293,194.16." These amounts are each one-sixth the amount of the actual damages the jury awarded to plaintiff.

[4] Alcon, Coherent, HGM, and Iris Laser Lightsource.

Company (Iredex), besides manufacturing and selling to ophthalmologists a laser light generator for performing laser surgery inside the eye, also manufactures and sells disposable[5] laser probe instruments for this surgery. Of the four lines on the market, because of its acknowledged high quality, the Iredex laser light source unit is the one most widely used by hospitals and doctors for this surgery. Iredex attempted to maintain its influence in this area by designing a special connection between its disposable surgical probes and its laser light source unit.[6]

Plaintiff Synergetics designs and manufactures ophthalmic surgical equipment which it sells to physicians and hospitals. Synergetics was begun by Greg Scheller in 1992. Scheller started his career as a mechanical and design engineer with McDonnell Douglas from 1979 to approximately 1983. Then he went with Storz Business, the world's largest source of ophthalmic surgical instruments for cataract surgery, which is performed on the outside of the eye. Since then, Scheller has developed 25 patents on surgical instruments for the eye.

In approximately 1987, Scheller and two others began Advanced Surgical Products. With this enterprise, he invented the first disposable fibre optical surgical illuminator, a device used to illuminate the interior of the eye for surgery. Ultimately he sold Advanced Surgical Products to STI which in time became Infinitech. Scheller remained with Infinitech for two years, in charge of its research and development.

In 1992 Scheller started Synergetics, initially manufacturing surgical instruments developed by a physician at Barnes Hospital in St. Louis. These products were sold in the United States through Infinitech.

---

[5]Disposable laser probes (used once and then discarded) were developed so that surgeons and hospitals could avoid the risk of spreading infection from one patient to another. There are approximately 1,500 eye surgeons who use many disposable probes. Participating in the marketing of the probes to these surgeons has substantial economic benefits.

[6]Typically these units last from 6 to 10 years before they need to be replaced.

In 1994 Scheller hired Christopher Lumpkin to work in Synergetics's instrument shop to develop prototypes of products. In 2000, Lumpkin left Synergetics and moved to Colorado. Within six months after Lumpkin left, Scheller and he developed a consulting arrangement whereby Lumpkin, on a part-time basis, would aid Synergetics in developing products. In time Lumpkin became a research and development technician for Synergetics, working one week per month in Synergetics's plant.

Between 1996 and 2002, Scheller and Synergetics also employed Michael Auld to develop products. Scheller knew Auld from their days together at McDonnell Douglas and Storz. Scheller made Auld the head of Synergetics's research and development. Ultimately, Auld became the direct inventor of the Iredex adapter (IRIS adapter) owned by Synergetics. This adapter could connect Synergetics's own disposable probes to the popular Iredex laser unit. Synergetics spent some $300,000 to develop this adapter. In this effort its personnel spent much time working with surgeons, observing surgeries, and making design and engineering drawings of its products. These drawings contained the tolerances, measurements, and torque specifications for the IRIS adapter. Synergetics's Iredex adapter cannot be reverse-engineered without being destroyed in the process, yielding the investigating engineer nothing.

In 2000, Synergetics began preparing and using monthly Disposable Product Reports, which it provided to its sales representatives. Each month, these reports contained data from the preceding 12 months and included item catalog numbers, amounts of sales, and the different prices offered to different customers. Such information was used strictly within Synergetics; it was not shared outside its operations.

Scheller and Synergetics hired sales personnel to market their products. On March 20, 2000, Synergetics hired Charles Hurst as a Clinical Specialist primarily to train sales representatives to sell the ophthalmic surgical instruments, including its IRIS adapter. Hurst had 14 years experience in the field of ophthalmic surgical equipment sales, including employment by Infinitech, Inc. Infinitech had represented and sold Synergetics's products from 1992 to 1995. However, when Alcon

bought Infinitech, Hurst was let go.  Now, Hurst's job with Synergetics was to market products to customers in the south and southwest United States.  On February 5, 2001, Hurst signed a confidentiality agreement with Synergetics.  Until 2002, Hurst's performance was excellent.  Until Scheller terminated Hurst, Synergetics paid Hurst a salary between $100,000 and $150,000 per year.

On December 11, 2000, Synergetics hired Michael McGowan.  Scheller knew that McGowan had been out of work for about a year.  McGowan had approximately 27 years experience in ophthalmic surgical equipment sales.  Like Hurst, McGowan had worked for Infinitech.[7]  Originally, Scheller wanted McGowan for Synergetics's international sales of the disposable probes.  However, McGowan's job responsibilities included sales and training, focusing on customers in the east and northeast regions of the United States.  On February 5, 2001, McGowan also signed a confidentiality agreement with Synergetics.[8]

---

[7] McGowan and Hurst had known each other for about 20 years. Since 1996 they discussed owning their own business.

[8] Each of the confidentiality agreements provided in part:

2.  Confidential and Proprietary Information

During my employment with the Company, and solely as a result of such employment, I may be given access to certain Confidential Information about the Company and its customers, as hereinafter described, and I may become the Company's primary contact with certain of its customers and prospective customers.  "Confidential Information" shall mean all information not of general knowledge in the industry of the Company relating to the business now or ever carried on by the Company, including without limitation information about the Company's property, processes, plans, patterns, devices, past, current and future customers and supplier lists, pricing lists, employee files, job descriptions and responsibilities, invoice, production and marketing methods, management information systems and financial system.  Confidential information also includes without limitation the Intellectual Property of the Company.  "Intellectual Property" shall mean all inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas of the Company (whether or not patentable or copyrightable or constituting

In their employment positions with Synergetics, Hurst and McGowan became members of the select policy-making PAC committee. On that committee, they received the monthly Disposable Products Reports and they discussed development and marketing of Synergetics's products.[9]

In November 2001, Hurst and McGowan began planning a company which would compete with Synergetics. This company ultimately became Innovatech Surgical, Inc., of which McGowan became the President and Hurst the Secretary. While Hurst and McGowan worked for Synergetics, Lumpkin assisted them and Innovatech to develop a competing adapter for the Iredex laser unit; in doing this, Lumpkin retrieved components from

---

> trade secrets). Confidential Information shall also include the Company's customer list and good will in relation to its customer and prospective customers. I acknowledge and agree that all of the Confidential Information, as described herein, has been and will continue to be developed through the investment by the Company of substantial time, money, and effort. I further acknowledge and agree that I was provided access to the Company's Confidential Information prior to the execution of the Agreement.
>
> * * *
>
> 5. Remedies for Breach
>
> I acknowledge that if I fail to observe or perform any of my agreements or covenants set forth in this Agreement, thereby breaching this Agreement, monetary damages would not provide the Company with an adequate remedy for such breach, and I hereby consent, in addition to any monetary award or other remedies available to the Company, at law or in equity, to the entry of an order in any court of competent jurisdiction enjoining any activity in which I am engaging constituting a breach of this Agreement or otherwise ordering me to perform specifically any of my obligations under this Agreement.

Pl. Ex. 193.

[9]In its business Synergetics develops and sells hundreds of products, including surgical instruments for ophthalmic and for neurosurgical procedures. In so doing it develops technical data and customer data which it disseminates to its own employees on a need-to-know basis in ways that control and secure the confidentiality of the information.

Synergetics's trash and constructed products for Innovatech. By August 2002, Hurst and McGowan had made significant efforts to develop and market a laser probe through Innovatech.

After learning of his competitive activities, on July 22, 2002, Synergetics fired Hurst. On September 6, 2002, it fired McGowan.

Auld and Lumpkin planned to develop their own joint consulting firm in Colorado with funding from McGowan. However, neither the funding nor the business developed.

After Hurst and McGowan left Synergetics, but while Auld was employed by Synergetics, Auld worked with Lumpkin to create production drawings for Hurst and McGowan's Innovatech. With Lumpkin's knowledge, Auld used a computer to copy Synergetics's drawings, including critical dimensions and tolerances of Synergetics's products, in an automated, digital cut and paste method. Hurst and McGowan knew that Auld was aiding Lumpkin in developing the production drawings.

In September 2002, Auld left Synergetics. Also in September 2002, Scheller learned from a competitor's employee that products were appearing in the market that were similar to Synergetics's products.

By 2005 Synergetics grew into a business requiring 60,000 sq. feet of space with about 230 employees.

Innovatech markets and sells ophthalmic medical equipment, specifically microsurgical instruments for vitreoretinal surgeons, including disposable probes. As part of its business, Innovatech at one time sold an adapter that fit the Iredex laser unit; Innovatech's adapter would not accept Synergetic's disposable probes. In June 2005 Innovatech stopped making the IRIS adapter. Now, only Synergetics makes it.

Currently, only Iredex, Synergetics, and Innovatech have the technical ability to connect their disposable laser probes to the Iredex laser light unit.

Due to the competitive activities of Hurst and McGowan, using the confidential and trade secret information of Synergetics, while employed by Synergetics, Synergetics lost business with more than 20 accounts and customers. With their knowledge of Synergetics's pricing information,

Innovatech offered Synergetics's customers prices well below the Synergetics's prices. It was able to do so, because it did not expend the substantial amount of time, effort, expertise, and expense necessary to develop competing products. After Hurst and McGowan were fired by Synergetics, Synergetics began to meet its sales goals.

The total damages, reduced to present value, suffered and to be suffered by Synergetics on account of lost profits from lost sales to its established customers, on account of the actions of defendants from and including 2003 through 2008, is the sum of $1,759,165.

## **Actual Damages**

Defendants argue that plaintiff's actual damages should be limited to the two-year period of time it took plaintiff to develop its marketable IRIS adapter, the corollary being that defendants would have developed a competitive IRIS adapter within that two-year period of time. On the issue of actual damages, the jury was instructed as follows:

> INSTRUCTION NO.  11
>
> If you find in favor of plaintiff Synergetics on any of its claims against defendants Hurst or McGowan, then you must award plaintiff Synergetics such sum as actual damages as you believe will fairly and justly compensate plaintiff for any actual damages you believe plaintiff Synergetics sustained as a direct result of the occurrence mentioned in the evidence.
>
> You may award only an amount that would fairly compensate plaintiff Synergetics for damages directly caused by defendants Hurst or McGowan's use of trade secret information or confidential information of the plaintiff. You may consider, in awarding such actual damages, the profits that Synergetics lost due to competition from defendants Hurst or McGowan's use of trade secret information or confidential information of the plaintiff, or the profits gained by the defendants through the use of the trade secret information or the confidential information of the plaintiff, ***but only during the time that the defendants would not otherwise have been able to compete without the assistance of plaintiff Synergetics's trade secret information or confidential information of the plaintiff. The determination of the time involved should be made upon the basis of the manpower used by defendants Hurst or McGowan in their actual operation, not on***

> *the basis of what might have been accomplished with staffs of another size.*
>
> You are instructed that you may not compensate plaintiff for any item of actual damage more than one time.

See Doc. 195, at 30 (emphasis added). The trial evidence supported the jury's finding of actual damages. The evidence before the jury included plaintiff's expert's analysis and calculations based upon business records of the plaintiff's lost profits, and upon information that no other provider of ophthalmic surgical instruments in this market developed and marketed a competitive product, despite great economic incentive. Therefore, the court will not reduce the actual damages award.

### **Punitive Damages**

Under Missouri law, punitive damages may be available where it is established by clear and convincing evidence, Rodriguez v. Suzuki Motor Corp., 936 S.W.2d 104, 110 (Mo. 1996)(en banc), that the defendant acted with evil motive or with reckless indifference to the rights of the plaintiff. Blue v. Harrah's North Kansas City, LLC, 170 S.W.3d 466, 477 (Mo. Ct. App. 2005).

Defendants argue that the punitive damages awards are excessive in violation of the Due Process Clause of the Fourteenth Amendment. In BMW of North Am., Inc. v. Gore, Jr., 517 U.S. 559 (1996), the court held that the Due Process Clause of the Fourteenth Amendment prohibits the imposition of a grossly excessive punishment on a tortfeasor. Gore, 517 U.S. at 568. A party, such as each of the defendants in this case, is entitled to fair notice of (a) the conduct that will subject him to punishment, and (b) the severity of the penalty that could be imposed. Relevant factors include (1) the degree of reprehensibility of the tortfeasor's actions, (2) any disparity between the harm suffered or likely to be suffered and the punitive damages award, and (3) the difference between the punitive damages award and the civil remedies authorized or imposed in comparable cases. Id. at 574-75.

In State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003), the court made several significant rulings. The court described the purpose of compensatory damages to be to redress a concrete loss and the purposes of punitive damages to involve deterrence and retribution. State Farm, 538 U.S. at 416. The Due Process Clause of the Fourteenth Amendment prohibits "grossly excessive or arbitrary punishments of a tortfeasor." Id. The court described factors that indicate unconstitutionally excessive punitive damage awards, including the degree of reprehensibility of the defendant's conduct. Relevant to the reprehensibility factor, which the court described as the "most important indicium of reasonableness of a punitive damages award," id. at 419,[10] is whether the conduct involved

(1) physical harm or economic harm;
(2) indifference or reckless disregard of the health or safety of others;
(3) the target of the conduct being financially vulnerable;
(4) conduct that was isolated or repeated; and
(5) harm resulting from mere accident or intentional malice, trickery, or deceit.

Id. See also, Diesel Machinery, Inc. v. B.R. Lee Industries, Inc., 418 F.3d 820, 839 (8th Cir. 2005).

The court's instruction to the jury in this case comported with the applicable constitutional law regarding punitive damages:

INSTRUCTION NO. __12__

In addition to the actual damages mentioned in other instructions, the law permits the jury under limited extraordinary circumstances to award punitive damages.

If you find in favor of plaintiff Synergetics on any claim against defendants Hurst or McGowan (other than the claim for breach of contract), and if you further find by clear and convincing evidence that the conduct of defendant Hurst or McGowan was outrageous because defendant had an evil motive or acted in reckless indifference to the rights of plaintiff Synergetics, then in addition to any other, actual

---

[10] See also Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 603 (8th Cir. 2005).

> damages to which you find plaintiff Synergetics entitled under
> Instruction Number 11 as to any claim other than for breach of
> contract, you may, but are not required to, award plaintiff
> Synergetics an additional amount as punitive damages. The
> purposes of punitive damages are only to punish the wrongdoer
> for extraordinary misconduct, and to deter that wrongdoer or any
> other wrongdoer from repeating similar conduct. In deciding
> whether or not to award punitive damages, you may consider
> whether either defendant intended to perform the wrongful act
> and knew it was wrongful. Whether or not to award plaintiff
> punitive damages is within your sound discretion.
>
> If you award punitive damages, they must bear a reasonable
> relationship to the harm suffered by plaintiff and the amount of
> any actual damages awarded. Also, you must consider the nature
> of the conduct of the respective defendant under all of the
> circumstances, the frequency of the respective defendant's
> conduct, how reprehensible the defendant's conduct was toward
> the plaintiff, the defendant's financial condition, and any
> mitigating circumstances.
>
> You may assess punitive damages against either or both
> defendants or you may refuse to impose punitive damages. If
> punitive damages are assessed against both defendants, the
> amounts assessed against such defendants may be the same or they
> may be different.

See Doc. 195, at 31.

In this court's analysis, the evidence of the relevant factors supports a judgment of moderate punitive damages. The defendants' actions resulted in economic harm to a plaintiff that was not so financially vulnerable that defendants' actions caused it to go out of business. No evidence indicated that the health or safety of others was at risk by the defendants' actions.

Defendants argue that the court should reduce or set aside the punitive damages award, because none of the defendants' actions are of a sufficient nature to justify punitive damages. The court disagrees. There is substantial evidence in the record that both defendants, while employees of plaintiff, intentionally and without permission acquired and later used in competition with plaintiff its confidential and technical information and customer information, and also knowingly used Michael Auld, a trusted employee of plaintiff, who digitally reproduced for defendants technical drawings and their specifications belonging to the plaintiff, for products

including the Iris adapter.[11]  See Auld Dep. at 154-74.  Thereafter, in spite of relevant pretrial discovery requests, defendants failed to disclose Auld's activity.  Auld knew what he was doing was not proper.  Id. at 114.  Ultimately, when he saw that the case was going to be tried and not settled, as he had hoped, Auld concluded to himself, and so stated in his deposition shortly before trial, that "the jig was up."  Id. at 139.  Indeed, the record supports the findings of the jury, by clear and convincing evidence, that the defendants acted in an outrageous manner toward plaintiff.

Defendants argue that the evidence indicates that they are well respected salesmen in the vitreoretinal instruments industry who merely committed errors of judgment in an effort to form their own business company.  They argue that plaintiff was fully compensated by the actual damages and that the punitive damages are not reasonably proportional to the defendants' financial condition.[12]  These arguments do not persuade.

A very important factor in determining whether the punitive damages award is excessive is the ratio between the harm suffered by the plaintiff and the punitive damages award.  While this involves more than a mere mathematical calculation, State Farm, 538 U.S. at 424-25, the amount determined by the jury in this case is  below a size that invites enhanced constitutional analysis, i.e., one that exceeds a single-digit ratio when compared with the actual damages.  Id. at 425.

In this case, the total of the amounts of punitive damages was just one-third the amount of the actual damages.  The court concludes that such sum is both reasonable and proportionate to the plaintiff's injury and its business circumstances.

---

[11]Auld testified in his deposition that he discussed with McGowan the fact that he was working on drawings for Innovatech. (Auld Dep. at 114-16.)

[12]Defendant Hurst testified that his net worth is about $50,000. Defendant McGowan testified in a manner that indicated that he is not wealthy.

## Injunctive relief

Plaintiff's motion for judgment also seeks the entry of injunctive relief. Such a determination is committed to the court, sitting without the jury; in making such a determination, the court must be guided by the findings of fact made by the jury. <u>Whiteside Biomechanics, Inc. v. Sofamor Danek Group, Inc.</u>, 88 F. Supp.2d 1009, 1012-13 (E.D. Mo. 2000), <u>aff'd</u> <u>Whiteside Biomechanics, Inc. v. Danek Medical, Inc.</u>, 13 Fed.Appx. 950 (Fed. Cir. 2001). No party offered evidence on plaintiff's entitlement to injunctive relief other than was submitted to the jury. Therefore, the facts described above guide the court in the determination of plaintiff's claim for injunctive relief.

Plaintiff seeks to have defendants enjoined (1) permanently from marketing IRIS adapters; (2) from using or disclosing plaintiff's dimensions and tolerances regarding its surgical forceps and scissors products for as long as this information remains a trade secret; (3) to destroy all drawings and other materials that have information related to the specific dimensions and tolerances of the IRIS adapter and to destroy defendants' inventory of adapters; (4) from the use or disclosure of the customer and product information which defendants misappropriated, <u>i.e.</u>, plaintiff's pricing, product information, product prioritization, and customer information; and (5) for two years from contacting or selling products, competitive with plaintiff's products, to any of the entities with whom the jury found defendants intentionally interfered.

Under the Missouri Uniform Trade Secrets Act, "[a]ctual or threatened misappropriation may be enjoined." Rev. Stat. Mo. § 417.455(1); <u>Khazai v. Watlow Elec. Mfg. Co.</u>, 201 F. Supp.2d 967, 974 (E.D. Mo. 2001). Also, the jury found that both defendants breached the confidentiality agreements each signed when employed by plaintiff; each of these agreements provides for the remedy of injunctive relief. <u>See</u> footnote 5, above.

As to the proper length of injunctive relief, the court stated in a similar case:

> Of special importance is the length of time during which [the tortfeasor] should be enjoined from disclosing the subject trade secret information. Under Missouri law, the beginning point is the date [the tortfeasor] was terminated. <u>Superior Gearbox</u>

> Company v. Edwards, 869 S.W.2d 239, 246- 47 (Mo. Ct. App.1993); see also AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 724 (Mo. Ct. App.1995).
>
> In a case involving the misappropriation of trade secrets, Missouri courts employ the so-called "head start" rule. . . . Under that rule, [the prevailing party is] entitled to present evidence of how long it would have taken them to reproduce [the employer's trade secrets], absent the misappropriation. . . .
>
> The head start rule is based on the premise that, by misappropriating trade secrets, [employees] were able to cut short the time it would otherwise have taken them to reproduce [the employer's trade secrets]. . . . That does not mean, however, that [employees] should be enjoined for unreasonable length of time. Superior Gearbox Company, 869 S.W.2d at 250-51 (citations omitted); see also A.B. Chance Company, 719 S.W.2d at 859.

Khazai, 201 F. Supp.2d at 975. An open-ended or indefinite period of time for an injunction is unreasonable and unenforceable. Id.

### IRIS adapters and other competing products lawfully developed

Plaintiff argues that defendants should be permanently enjoined from making and marketing their IRIS adapter, and for a lesser period from marketing to plaintiff's customers other products that compete with plaintiff's products. It argues that the record establishes that no one has yet been able to replicate its IRIS adapter and that there is no reason to think that defendants could ever develop an IRIS adapter on their own. Therefore, plaintiff argues, a permanent injunction prohibiting them from developing and marketing an IRIS adapter is appropriate.

The court disagrees for two reasons. First, the court is not persuaded that, in the evolving market of ophthalmic surgical equipment, defendants could not on their own *ever* develop an IRIS adapter, and other surgical instruments, that did not involve the use of plaintiff's trade secrets. Second, the jury compensated plaintiff for, not only the actual damages it suffered up to the date of the jury's special verdict, but also for the time up to and including 2008, after having been clearly instructed that they were to award plaintiff actual damages "during the time that the defendants would not otherwise have been able to compete without the

assistance of plaintiff Synergetics's trade secret information or confidential information of the plaintiff." See Doc. 195 at 30, quoted above. The jury awarded plaintiff all monetary relief that was sought, including lost profits through 2008. To award plaintiff injunctive relief for this period of time also, by forbidding defendants from competing with plaintiff during the defined future period and thereby depriving defendants of profits they otherwise would have garnered, would in effect be awarding plaintiff double damages for the same injury. This the court concludes is not appropriate. <u>Whiteside Biomechanics, Inc. v. Sofamor Danek Group, Inc.</u>, 88 F. Supp.2d 1009, 1020 (E.D. Mo. 2000).

<u>Use of plaintiff's trade secret information</u>

Plaintiff seeks an injunction to keep defendants from using or disclosing, for as long as the information remains plaintiff's trade secret, the dimensions and tolerances of plaintiff's surgical forceps and scissors products, plaintiff's pricing information, product information, product prioritization, and customer information.

The court concludes that plaintiff is entitled to this relief, which is nothing more than forbidding defendants from using the information they misappropriated from plaintiff for as long as it remains a trade secret of plaintiff. The court will grant such relief for a prospective period of two years, which the court finds and concludes is the period that defendants would have used to develop such data on their own through observation and investigation.

<u>Destruction of materials</u>

The court will grant plaintiff an injunction requiring defendants, within 45 days, to destroy all drawings and other materials that contain the specific dimensions and tolerances of the IRIS adapter and other products developed by plaintiff and to destroy defendants' inventory of adapters. This goes to the core of the misappropriation committed by defendants. The record indicates that defendants no longer market IRIS adapters.

For these reasons, the court will enter judgment consistent with the jury's findings, including injunctive relief, and deny the motion of defendants for remittitur.

_____
**DAVID D. NOCE**
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 9, 2005.