UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SYNERGETICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:04CV318  CDP |
| | ) | |
| CHARLES RICHARD HURST, JR., | ) | |
| and MICHAEL MCGOWAN, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND MEMORANDUM

Synergetics, Inc. won a judgment of more than two million dollars against

Charles Hurst and Michael McGowan following a jury trial.  Hurst and McGowan

now move to vacate the judgment and alternatively seek sanctions.  They assert

that Synergetics engaged in obstruction of justice and witness tampering by

inducing a witness for the defense, Christopher Lumpkin, not to testify at trial.

I conclude that Gregg Scheller, Synergetics' CEO, wrongfully conditioned

the settlement of a separate lawsuit against Lumpkin on Lumpkin's last-minute

agreement not to testify for Hurst and McGowan.  Witness tampering is a serious

interference with the justice system that the court must not ignore.

I will not vacate the judgment, however.  Although Scheller wrongfully

induced Lumpkin not to testify, Hurst and McGowan were not deprived entirely of

Lumpkin's evidence, because his deposition testimony was read to the jury. Additionally, the evidence of Hurst and McGowan's wrongdoing is so overwhelming that vacating the judgment would unjustly reward their wrongful behavior. Lumpkin's testimony would not have overcome the mountain of evidence supporting the verdict, and may well have hurt Hurst and McGowan's case. A new trial would present serious procedural obstacles, and it would be very difficult for a jury to sort out the truth from the many conflicting stories that have already been told.

But there must be consequences for Synergetics from Scheller's wrongful behavior. I will therefore impose monetary sanctions under the court's inherent power to protect the integrity of the judicial process. Synergetics must pay Hurst and McGowan jointly the sum of $1,172,776.66 as a sanction for Synergetics' witness tampering.

## Witness Tampering

It is a federal crime to give a witness something of value to induce the witness not to testify. 18 U.S.C. § 201(b)(3) provides felony penalties for one who:

> directly or indirectly, corruptly gives, offers or promises anything of value to any person . . . with intent to influence such person to absent himself [from a court proceeding].

18 U.S.C. § 1512(b)(1) also provides felony penalties for a person who:

> knowingly . . . corruptly persuades another person . . . with intent to . . . prevent the testimony of any person in an official proceeding.

Although non-party witnesses are under no obligation to testify voluntarily or to assist litigants in their cases, witnesses must testify if subpoenaed. If a witness not under subpoena has voluntarily agreed to testify for one party, it is "serious misconduct" for the other party to dissuade that witness from testifying. Ty v. Softbelly's, Inc., 353 F.3d 528, 537 (7th Cir. 2003). An attempt to convince a witness not to testify may be proof that the party seeking to suppress the testimony has something to hide:

> It is generally held that, in a civil case, evidence that a litigant, or his agent, has attempted to influence or suppress a witness is receivable as an admission or as an indication of the litigant's consciousness that his case is weak or unfounded or that his claim is false or fraudulent. Specifically, an attempt to persuade a witness not to testify is admissible against the party responsible for that attempt.

Great American Insurance Co. v. Horab, 309 F.2d 262, 264 (8th Cir. 1962) (Blackmun, J.) (internal citations omitted). A lawyer may not ethically counsel a non-client witness to refuse to talk to opposing counsel. See Rule 3.4(f), Rules of Professional Conduct, Rule 4-3.4(f), Mo. R. Civ. P. If such an attempt has occurred, the jury is entitled to draw an inference that the witness's testimony would favor the other party. Massachusetts Institute of Technology v. Imclone

<u>Systems, Inc.</u>, 490 F.Supp.2d 119, 127 (D. Mass. 2007).

## **Factual and Procedural Background**

Defendants Charles Hurst and Michael McGowan were Synergetics sales people who formed a competing company – later incorporated under the name Innovatech – while they were still employed at Synergetics. They hired Christopher Lumpkin, a former Synergetics employee who still had a consulting arrangement with Synergetics, to develop prototypes of their proposed products. The products were directly competitive with products that Hurst, McGowan and Lumpkin had handled for Synergetics. Lumpkin, in turn, asked another Synergetics employee, Mike Auld, to prepare engineering drawings for the products, and Innovatech used those drawings to have its products manufactured. Auld, who had helped invent one of the Synergetics products – a laser adapter[1] – prepared the drawings for Innovatech's competing adapter by copying and pasting from Synergetics' AutoCAD (computer assisted design) drawings. Among the items Auld copied were specific, detailed measurements and tolerances, which are crucial to the adapter's functionality. None of this activity, of course, was

---

[1] The adapter allowed Synergetics, who was the leading medical laser probe producer, to sell its own probes to customers who used lasers made by Iridex, the leading laser producer. Synergetics and Innovatech were the only companies who sold this kind of adapter; without the adapter, only Iridex probes could be used with Iridex lasers.

reported to Synergetics management while it was going on.

Hurst and McGowan also used Synergetics' confidential sales data and other trade secret information to solicit the business of many of Synergetics' hospital and physician customers. They solicited some customers before they left Synergetics, and they began developing their products and their marketing strategies while still employed. Hurst and McGowan had both signed confidentiality agreements with Synergetics, so their actions in using the trade secrets not only violated state trade-secret law and their duty of loyalty to their employer, but also breached those contracts.

Hurst left Synergetics in July 2002; McGowan was fired in September 2002. Lumpkin's work building prototypes for Innovatech began in early 2002 while he was working as a consultant for Synergetics. During that time Lumpkin was spending about one week each month at Synergetics' facility. Lumpkin fabricated several of Innovatech's prototypes using scrap materials he surreptitiously took from the Synergetics facility.

Synergetics filed this suit in February of 2004, without knowing of the participation of either Lumpkin or Auld. From the beginning of the litigation, Lumpkin agreed to testify and to help Hurst and McGowan defend the case. He participated in numerous meetings with them and their lawyer to discuss defenses

and trial strategy.

In September of 2004 McGowan provided interrogatory answers swearing that he had not spoken with any Synergetics employee, except for casual conversation with Gregg Scheller (Synergetics' CEO), at trade shows. The interrogatory answer was false, because McGowan had spoken to Auld numerous times during 2003 while Auld was preparing the engineering drawings for Innovatech.

In November of 2004 Lumpkin gave his deposition in this case. He falsely testified that he had prepared the engineering drawings for Innovatech's adapter. He said that "a friend" – who he eventually disclosed was Auld – had given him a copy of Auld's personal version of AutoCAD (the computer program needed to do the drawings). Lumpkin said that he did not tell anyone at Synergetics that he was working with Innovatech, and he testified that he had never told Auld that he was using the CAD system for anyone other than Synergetics. All this was false, of course, because Lumpkin knew that Auld himself had done the CAD drawings for Innovatech. McGowan attended the Lumpkin deposition, and he also knew very well that Auld had done the drawings, but he did not tell anyone that Lumpkin had testified falsely. Synergetics brought a separate lawsuit against Lumpkin shortly

after his deposition.[2]

Auld was Synergetics' head of research and design. When Synergetics' trial lawyers suspected that the Innovatech engineering drawings were too similar to Synergetics' drawings for coincidence, they decided to call Auld as an expert witness to opine that the drawings must have been copied. Shortly before his deposition was to be taken, Auld told Scheller that he himself was the person who copied the Synergetics drawings for Innovatech – which certainly obviated the need for an expert opinion on copying. The lawyers postponed the Auld deposition, and Synergetics fired him. He was, however, given a generous severance package.

Lumpkin gave a second deposition on April 27, 2005.[3] By that time he knew that Auld had revealed his role, so Lumpkin admitted that Auld had both prepared the drawings and copied them from Synergetics' computer records. He testified that he only learned of Auld's copying after his first deposition. Lumpkin testified that when he learned of the copying, he met with McGowan and Auld to discuss "what he [Auld] had done." Although Lumpkin knew that McGowan and

---

[2]Synergetics, Inc. v. Christopher Lumpkin, No. 4:04CV1650 TCM (E.D. Mo.).

[3]This deposition was taken in a related case, Synergetics, Inc. v. Peregrine Surgical, Ltd., Innovatech Surgical, Inc. and Iridex Corp., pending in the Eastern District of Pennsylvania, Case No. 06-CV-107.

Auld had spoken many times previously about the drawings, he implied that this was the first meeting between the two, and he falsely testified that McGowan had earlier believed that Lumpkin had done the drawings. He also falsely testified that neither Hurst nor McGowan had been in direct contact with Auld while Auld was doing the drawings.

On August 31, 2005, Auld gave his deposition, and testified that he had prepared the Innovatech drawings by cutting and pasting from Synergetics' CAD documents, which he acknowledged were trade secrets. He also testified that he had talked with McGowan during that process, which contradicted both McGowan's sworn interrogatories and Lumpkin's deposition testimony. McGowan did not admit to these conversations until trial, which he described in the post-trial motion hearing as when he "came clean to the jury."

On September 7, 2005 – the week before the Hurst and McGowan trial – Lumpkin's case went to court-ordered mediation. Lumpkin, who lived in Colorado, appeared in St. Louis with his lawyer, Alan Press. Synergetics appeared though its CEO, Gregg Scheller, and its attorney, Rudy Telscher. Telscher was also Synergetics' lead trial counsel in the Hurst and McGowan case. At the mediation there was some discussion about Lumpkin's not cooperating with Hurst and McGowan. After several hours, Lumpkin and Scheller indicated that they

wanted to talk without the lawyers present, and they did so.  The case did not settle that day, but Lumpkin and Scheller wanted to continue discussing a potential settlement on their own, and the lawyers and mediator agreed this was a good idea.  Although Telscher agreed to the continuing discussions, he told the mediator, Press and Scheller that he did not want to settle the Lumpkin case until after the Hurst and McGowan trial.

Attorneys Telscher and Press exchanged emails the next day and on Friday, September 9.  In those emails Telscher stated that although he hoped the clients could continue working on a settlement, he feared that a settlement could be used against Synergetics in the upcoming Hurst and McGowan trial.  Telscher told Press that his concerns were that if they settled and Lumpkin did not testify, it could "be portrayed as Synergetics 'buying off' a witness," and that even if Lumpkin did testify, "it could be portrayed that we were trying to influence his testimony."  He concluded that email by saying, "Thus, our view is that Lumpkin should decide to either testify or not based on his own strategies and concerns and without regard to an actual settlement or even a potential settlement."

Judge Noce[4] held a final pretrial conference on September 9, and, among

---

[4]Magistrate Judge David D. Noce presided over the trial, with consent of the parties under 28 U.S.C. § 636(c).  The case was transferred to me when the motion to vacate was filed.

other things, granted a Synergetics motion in limine to exclude certain evidence.[5]

Judge Noce ruled that Hurst and McGowan could not present evidence that

Scheller had set up a "sham company" to avoid a non-compete agreement Scheller

had with a former employer, Infinitech. Hurst and McGowan also sought to

introduce evidence that Synergetics had wrongfully used Infinitech's drawings for

its own laser probes. Although Judge Noce did not exclude this evidence in

limine, he later excluded it because the Infinitech drawings were not for any of the

products at issue in this case.[6]

Over the weekend before trial, Lumpkin and Scheller met three times to

discuss settling the Lumpkin case. Lumpkin secretly tape-recorded some, but not

all, of each conversation. Lumpkin and Scheller discussed settling the lawsuit

through an arrangement whereby Lumpkin would work as a consultant for

Synergetics. Most of the discussion of over all three meetings related to the

economics of a possible arrangement and whether Lumpkin and Scheller really

wanted to do business together. Although there was relatively little discussion of

the Hurst and McGowan lawsuit, it is apparent that both parties considered the

upcoming trial a deadline. It is also apparent that Scheller very much wanted to

---

[5]Described more fully in Synergetics' Supplemental Brief [docket # 166].

[6]September 15, 2005 trial transcript, p. 79, l.22 to p. 82, l. 14 [docket # 215].

settle the case in a way that would keep Lumpkin from testifying, even though Telscher had advised against it. They discussed Telscher's concerns, and Scheller repeatedly expressed his reluctance to put anything in writing. They spent some time discussing whether they trusted one another, and agreed that if anything was resolved it would be a "handshake" or "gentleman's contract." At one point when Lumpkin asked Scheller what he wanted, Scheller replied: "I want you to go home. I want you to get out of Missouri is what I want you to do. You being here is freaking me out. If they find out we're talking, you're getting a subpoena."

Lumpkin began the third meeting (which was on Sunday afternoon) by saying that he didn't believe he could work for Synergetics again, and he suggested that "we just drop the lawsuits on each other, quit the bullshit and I just don't show up at trial?" Scheller responded that that was "Ok" but expressed a continued interest in being sure that Lumpkin would not work for Hurst and McGowan. After some discussion Scheller said: "All right. All right. So, all right. We got a deal. I drop the suit, you drop the suit, don't testify and you can't work for Innovatech."

Following their meeting, Lumpkin and Scheller notified their respective lawyers that they had settled the case. Lumpkin, however, did not tell his attorney that the settlement included an agreement that he not testify for Hurst and

McGowan.  Scheller did tell his lawyer that Lumpkin's not testifying was part of the deal, and Telscher said something to the effect of "We are not going to do that."  Press emailed Telscher to confirm that the parties had agreed to settle the case on the basis that Lumpkin would not work with Innovatech in the future and they would dismiss their claims and exchange mutual releases.  Telscher indicated in a return email that he had the same understanding of the settlement.

The trial began Monday, September 12, 2005.  Synergetics called as live witnesses Michele Meert (Synergetics Director of Marketing), Scheller, McGowan, Mark Dischert (Synergetics VP of sales), and Ronald Vollman (a damages expert).  It presented deposition testimony of Mike Auld and Chris Lumpkin.

On Tuesday, September 13, when Synergetics was to begin reading portions of Lumpkin's deposition to the jury, Synergetics' counsel stated that Lumpkin was unavailable for trial, and defense counsel Greg Upchurch did not object.  Defendants had counter-designated portions of both Lumpkin's and Auld's depositions, and the defendants' counter-designations were presented to the jury along with the Synergetics' portions.  McGowan knew that Lumpkin was in St. Louis, but did not tell either lawyer.

On Tuesday evening, after Lumpkin's deposition was read to the jury,

Lumpkin and McGowan spoke on the telephone. Neither man recalls much that was discussed, except for the following: McGowan asked Lumpkin whether they could still count on him, and Lumpkin answered "I'm not sure." Although Lumpkin never directly said he would not testify, and McGowan never directly asked him whether he was refusing to testify, McGowan understood that Lumpkin had made the decision. On Wednesday during trial McGowan told Upchurch that Lumpkin was "getting squirrely." Upchurch then decided not to call Lumpkin as a live witness. Defendants' case began around midday on Wednesday the 13th, and defendants concluded all their evidence on Friday, September 16. Lumpkin remained in St. Louis until Friday, and spoke on the telephone with McGowan on both Wednesday and Thursday. Although they spoke about the trial, McGowan did not again ask Lumpkin to testify. Upchurch was not aware that Lumpkin had been in town or that his case had gone to mediation the week before, although that was a matter of public record.[7] The witnesses Upchurch called in the defense case were Scheller, McGowan, Hurst, and William Kennedy, a damages expert.

Trial was adjourned from Friday until Tuesday. There was no trial on Monday because Synergetics was closing that day on a merger with Valley Forge Corp. This was a complicated financial deal that resulted in Scheller's becoming

_____

[7] Synergetics v. Lumpkin, Case. No. 4:04CV1650TCM, docket entry #24.

CEO of the combined, publicly-traded company. This financial transaction was extremely important to Synergetics and to Scheller personally, and Scheller and Lumpkin made several references to it and to the stock price during their weekend discussions. Scheller believed that Hurst and McGowan were using the counterclaim[8] and the related suit in Pennsylvania in an attempt to disrupt the merger and to adversely affect the stock price.

On Tuesday the jury heard closing arguments and then deliberated for approximately five hours before returning a verdict for Synergetics. The jury answered more than 50 individual questions, making detailed findings of fact regarding each claim. It awarded actual damages of $1,759,165. The jury found that punitive damages should be awarded, and initially wrote that each defendant should pay half of Synergetics' legal fees as a punitive damages award. Judge Noce, without objection from either counsel, told the jury that they were required to return a specific dollar figure, and sent them back for further deliberations. At that point the jury awarded punitive damages against each defendant in the amount of $293,194.16.[9]

---

[8]At the final pretrial conference Judge Noce had transferred the counterclaim to Pennsylvania, by agreement of the parties.

[9]The punitive damages award against each defendant is exactly one-sixth of the actual damage award.

Meanwhile, the Lumpkin settlement had not been reduced to writing. Shortly after the Hurst and McGowan trial ended, Press drafted a settlement agreement and sent it to Telscher. The draft prepared by Press did not include anything about Lumpkin's not testifying, because Lumpkin had still not told Press about that part of the agreement. Telscher revised the settlement agreement and returned it. The revisions substantially changed the scope of the agreed covenant not to compete: while Lumpkin and Scheller had only agreed that Lumpkin would not work with Hurst and McGowan, Synergetics' revised draft included an agreement not to work with many other companies and on many types of products. Press rejected the draft for this reason. On October 25, 2005, Telscher emailed Press with further attempts to negotiate a settlement, and stated that he did not believe there had actually been a settlement, because the lawyers had not agreed to any specific language. Press responded that the clients had indeed agreed to a settlement, and stated that he would file a motion to enforce settlement if necessary. From that point, the lawyers' discussions became more heated, with Telscher pointing out that Lumpkin was an admitted perjurer.

Press then talked to Lumpkin about filing a motion to enforce settlement, telling him that it would be a swearing match between him and Scheller. Lumpkin told Press about the recordings, and finally told him about the agreement not to

testify.  Press filed the motion to enforce settlement on November 2, 2006.[10]  He

quoted Sheller's statement: "So, all right . . . we got a deal.  I drop the suit, you

drop the suit, don't testify and you don't work for Innovatech."

Telscher responded to the motion to enforce settlement by threatening Rule

11 sanctions.  Press replied by saying that the motion was "unquesionably accurate

and verifiable by independent evidence."  Telscher responded by again stating that

it was his "obligation under the Federal Rules to alert you to Rule 11," and asking

Press to provide the evidence he referred to.  Press then told Telscher that the

conversation had been recorded, but he declined to produce the recording.  Once

Telscher learned of the tape, but without ever listening to it, he withdrew his threat

of Rule 11 sanctions.  Scheller signed the original settlement agreement drafted by

Press a few days later, also without ever listening to the recording.

Back in this case, Judge Noce entered judgment in favor of Synergetics and

against Hurst and McGowan in accord with the jury's verdict.  Final judgment was

entered on December 9, 2005.  On December 8, 2006, defendants filed their

motion for relief under Rule 60.  By that time the case had been briefed and argued

before the Court of Appeals, but no decision had been rendered.  On February 5,

2007, the Court affirmed the judgment in all respects.  Shortly before the

---

[10]Docket entries ##27, 28 in Case No. 4:04CV1650 TCM.

scheduled hearing before me, Hurst and McGowan filed their motion for

sanctions.  I held a four-day hearing on both motions in June.

## Discussion

Defendants move to vacate the judgment entered against them under Federal

Rule of Civil Procedure 60(b)(3), and alternatively seek sanctions.  I conclude that

under the facts and the law, I would be justified in either vacating the judgment or

imposing significant sanctions.  In the exercise of my discretion, I choose not to

vacate the judgment and instead will impose a monetary sanction.  My reasons for

doing so under the applicable law follow.

Rule 60(b)(3) allows (but does not require) a court to vacate a judgment

because of "fraud (whether heretofore denominated intrinsic or extrinsic),

misrepresentation, or other misconduct of an adverse party . . . ."  Rule 60(b)

"provides for extraordinary relief which may be granted only upon an adequate

showing of exceptional circumstances."  <u>Robinson v. Armontrout</u>, 8 F.3d 6, 7 (8th

Cir. 1993).  "To prevail on a motion under Rule 60(b)(3), the movant must show,

with clear and convincing evidence, that the opposing party engaged in a fraud or

misrepresentation that prevented the movant from fully and fairly presenting its

case."  <u>Sellers v. Mineta</u>, 350 F.3d 706, 715 (8th Cir. 2003).  "The district court

has wide discretion in deciding whether or not to grant a motion under

Fed.R.Civ.P. 60(b) . . ."  Atkinson v. Prudential Property Co., Inc., 43 F.3d 367, 371 (8th Cir. 1994).  Rule 60(b) allows a court to set aside a judgment, but it cannot be used to impose additional affirmative relief.  Adduono v. World Hockey Assoc., 824 F.2d 617, 620 (8th Cir. 1987); see also U.S. v. $119, 980.00, 680 F.2d 106, 107-08 (11th Cir. 1982); U.S. v. One Toshiba Color Television, 213 F.3d 147, 158 (3d Cir. 2000); McCall-Bey v. Franzen, 777 F.2d 1178, 1186 (7th Cir. 1985)(effect of granting a Rule 60(b) motion is to restore original suit to the trial calendar).

"Despite the court's inability to award sanctions pursuant to Rule 60(b)(3), the court possesses the inherent power to sanction a party who acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Ty Inc. v. Softbelly's Inc., 2005 WL 326974, *6 -7 (N.D. Ill. Feb. 9, 2005) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)).  In Chambers the Supreme Court held that a court's inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  501 U.S. at 43 (citation omitted). While recognizing that inherent powers must be exercised with "restraint and discretion, . . . A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process."  Id. at 44-45;

see also Harlan v. Lewis, 982 F.2d 1255, 1262 (8th Cir. 1993).

1.    Was the Rule 60(b) motion timely filed?

A Rule 60(b) motion must be made "within a reasonable time, and . . . not more than one year after the judgment . . . was entered or taken."  Fed. R. Civ. P. 60(b).  Hurst and McGowan filed their motion on the last day before the expiration of the one-year period.  The one-year period is not a statute of limitations:  the rule requires that the motion be filed within a "reasonable time," and a court may deny the motion even if filed within a year if there was unreasonable delay.  See White v. American Airlines, Inc., 915 F.2d 1414, 1425 (10th Cir. 1990).  Under the circumstances here, the motion was filed within a reasonable time.

McGowan learned of the Lumpkin/Scheller agreement in early 2006 by doing his own research on the court's electronic files.  As soon as he learned that Lumpkin had agreed not to testify as part of his deal with Scheller, McGowan began trying to raise the issue in the various ongoing legal proceedings.  This case was on appeal, although Upchurch was no longer representing Hurst and McGowan because they owed his firm a great deal of money.  The lawyer handling the appeal told McGowan the matter could not be raised on appeal because it had not been part of the trial record.  McGowan's lawyer in the Philadelphia case also declined to get involved in the St. Louis case.  McGowan

ultimately approached Alan Press, Lumpkin's lawyer, and he agreed to bring the Rule 60 motion, but he needed to conduct a certain amount of investigation and research before filing it.  Under all of these circumstances, the motion was filed within a reasonable time.

2.  <u>Did Synergetics engage in misconduct by conditioning the Lumpkin settlement on Lumpkin's agreement not to testify?</u>

In <u>Ty v. Softbelly's, Inc.</u>, the Seventh Circuit held that if a party's CEO had induced a witness not to testify as an expert for the other side, then "there would have been compelling evidence of serious misconduct on the CEO's part, requiring a commensurately severe sanction, quite possibly dismissal of [plaintiff's] suit."  353 F.3d at 537.  On remand, the <u>Ty</u> trial court held an evidentiary hearing and concluded that the plaintiff's CEO had tampered with the witness by calling him with the intent of dissuading him from testifying, and that the witness was dissuaded from testifying.  <u>Ty, Inc. v. Softbelly's Inc.</u>, 2005 WL 326974 (N.D. Ill. Feb. 9, 2005).  The district court did not vacate the judgment, because the Seventh Circuit had already done so and had ordered a new trial on other grounds.  Instead, the district court imposed a sanction under its inherent authority:  it ordered that damages were forfeited, and ruled that if Ty prevailed after retrial of the case it would be limited to injunctive relief and costs.

Additionally, the Court ordered Ty to pay Softbelly's attorneys' fees and expenses incurred in litigating the post-trial motion and appeal.

A similar situation was presented in Harlan v. Lewis, 982 F.2d 1255 (8th Cir. 1993). There the Eighth Circuit affirmed a district court sanction award against a defense lawyer who improperly sought to convince two of the plaintiff's treating physicians not to talk to the plaintiff's testimony or provide expert testimony. The Court noted that Model Rule 3.4(f) of the Model Rules of Professional Conduct, which prohibit an attorney from requesting a "person other than a client to refrain from voluntarily giving relevant information to another party," provided an independent basis for the sanctions imposed by the district court. Id. at 1259.

Hurst and McGowan have shown by clear and convincing evidence that Synergetics provided something of value in exchange for Lumpkin's decision not to testify. Synergetics' lawsuit against Lumpkin was as valuable as its suit against Hurst and McGowan, which resulted in a two-million dollar verdict. Although Lumpkin did not have a non-compete agreement, he was working as a consultant for Synergetics when he knowingly used Synergetics' trade secret information and even some of its materials to help a competitor. Lumpkin was the one who asked Auld to do the engineering drawings, and while Lumpkin testified that he did not

realize Auld was copying them instead of creating new ones, a jury is not likely to have believed this testimony. Lumpkin has told three substantially different versions of the events under oath. Although he had filed a counterclaim against Synergetics, the parties and lawyers recognized that it was of very little value. Synergetics would likely have won a large judgment against Lumpkin had his case gone to trial. Although Lumpkin may not have had significant assets for collection of the judgment, a judgment would still have been very detrimental to him, and could have resulted in his personal bankruptcy.

The conduct in this case was certainly more blatant than that in either Ty v. Softbelly's or Harlan v. Lewis. Lumpkin's agreement not to testify was a material term of the settlement agreement. Scheller's comments on the recordings show that getting Lumpkin not to testify was a major objective of the settlement. Of course, getting Lumpkin to stop working for Hurst and McGowan was also a major objective of the settlement, but the recordings of the meetings show that preventing Lumpkin's testimony was very important to Scheller. And Scheller, unlike Lumpkin, immediately told his lawyer that Lumpkin's not testifying was part of the deal. While Telscher said something to the effect of "we are not going to do that," Scheller had already done it, and neither he nor Telscher did anything to "undo" it or to tell Lumpkin or his lawyer that the deal was off.

Scheller's reluctance to have anything put in writing and his later denial of the deal further support the conclusion that this was wrongful conduct. Indeed, Telscher's first response when Press filed the motion containing Lumpkin's version of the conversations was to threaten Rule 11 sanctions and point out that Lumpkin was an admitted perjurer. Both Telscher and Scheller were understandably confident that Scheller would win any "swearing contest" between the two. But once they learned that there was a recording of the conversations so Scheller's word would not automatically be believed, they immediately changed their hostile tune and signed the settlement agreement. That Scheller did so without even asking to listen to the tape reinforces the conclusion that Lumpkin's not testifying was part of the deal and Scheller knew it all along.

Synergetics has argued in its briefs that Scheller, a non-lawyer, had no reason to believe that he was doing anything wrong because the issue of Lumpkin's not testifying was discussed with the lawyers during the mediation. Although the evidence on what was discussed at the mediation is conflicting, the most reasonable testimony is that rendered by Alan Press. Press says the mediator told him Synergetics wanted an agreement that Lumpkin would not cooperate with Hurst and McGowan. His notes refer to "not cooperating." Press did not consider "not cooperating" to be the same as "not testifying." There were several lawsuits

pending, and Lumpkin had been actively working with Hurst and McGowan on the suits. Press described Lumpkin as "integral to the [Hurst and McGowan] trial team in their trial preparation and strategy development." He understood "not cooperate" to mean Lumpkin would stop doing those things, but not that it meant he would refuse to testify. Press understood that Lumpkin intended to stay in town all week after the mediation so he would be available to testify. Although Telscher lumps any discussion at the mediation of "not cooperating" together with "not testifying," he admits he did not spend much time thinking about it because he decided, as a matter of trial strategy, that they should not do it. The evidence as a whole does not support the argument that the lawyers discussed not testifying as part of a settlement at the mediation.

There is no requirement that non-party witnesses voluntarily meet with a party's lawyers or advise them on trial strategy – but witnesses are required to testify when subpoenaed. Lumpkin, of course, was not under subpoena, but he had agreed to testify and both he and Scheller knew defendants were expecting him to do so. Scheller decided to make a deal that Lumpkin not testify even though his lawyer had advised him against it.[11] Additionally, Scheller's comments

_____

[11]A lawyer may not ethically ask a non-client witness not to testify or not to cooperate with the other side. See Rule 3.4(f), Model Rules of Professional Conduct; see also ABA/BNA Lawyers' Manual on Professional Conduct, 61:716 (1997); Restatement (Third) of the Law

on the recording show that he believed he could negotiate with Lumpkin, tell Lumpkin that they had a "deal," but then not be bound by any deal, so long as the lawyers had not written it down. This indicates to me that he intended to lure Lumpkin into not testifying for Hurst and McGowan, but did not necessarily intend to hold up his end of the bargain. This conclusion is entirely consistent with his conduct when the motion to enforce settlement was filed, and confirms that his conduct was not an innocent misunderstanding of the rules of litigation.

3.  Did Synergetics engage in misconduct by telling Judge Noce that Lumpkin was unavailable for trial?

Defendants contend that Synergetics engaged in additional fraud and misconduct by telling the court that Lumpkin was "unavailable" for trial so his deposition testimony could be read to the jury. This would not have been misconduct had Scheller not procured Lumpkin's unavailability, but given that he did so, this was additional misconduct.

Lumpkin's deposition testimony could have been read at trial in lieu of live testimony under either Rule 804 of the Federal Rules of Evidence or Rule 32 of the Federal Rules of Civil Procedure. Both rules require Lumpkin to be

---

Governing Lawyers § 116(4)(2007) and Commentary §§ (c), (d), and (e); Rotunda and Dzienkowski, <u>Legal Ethics - The Lawyer's Deskbook on Professional Responsibility</u>, § 3.4-7 (2007-2008 ed.).

"unavailable."  The proponent of the deposition testimony bears the burden of demonstrating unavailability.  See Ohio v. Roberts, 448 U.S.56, 65 (1980).

The Rule 804(a) definition of  "unavailability" includes persons who cannot be served with trial subpoenas, but it provides an exception where the proponent procures the unavailability:

> A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.

Fed. R .Evid. 804(a).  "A good faith attempt to locate and subpoena the witness satisfies the proponent's obligation to demonstrate that the witness is unavailable." United States v. Harbin, 112 F.3d 974, 975 (8th Cir.1997) (quoting United States v. Flenoid, 949 F.2d 970, 972 (8th Cir.1991)).  "[T]he availability inquiry under Rule 804(a)(5) turns on whether the proponent of the former testimony acted in good faith and made a reasonable effort to bring the declarant to court." United States v. Johnson, 108 F.3d 919, 922 (8th Cir.1997).

Additionally, Rule 32 "creates an exception to the hearsay rules." Garcis-Martinez v. City and County of Denver, 392 F.3d 1187, 1190 (10th Cir. 2004). Under Rule 32(a)(3):

> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: . . . (B) that the witness is

at a greater distance than 100 miles from the place of trial or hearing,
. . . , unless it appears that the absence of the witness was procured by
the party offering the deposition; . . .

Fed. R. Civ. P. 32(a)(3).

As a practical matter, a witness's residence outside the subpoena power of

the court is routinely considered a sufficient reason that the witness cannot be

brought in live, and in most cases the deposition testimony of out-of-town

witnesses is handled just the same way that Lumpkin's deposition was handled at

this trial.  One lawyer tells the judge the witness is unavailable, and the other

lawyer does not object, because both lawyers know the witness lives out of town.

The deposition is then read to the jury.  This happens so routinely in trials that it

raises no suspicion.

Where a party objects, however, some courts have concluded that

depositions should not automatically be admitted.  In  <u>Kirk v. Raymark Industries,</u>

<u>Inc.</u>, 61 F.3d 147, 165 (3d Cir. 1995), a plaintiff was not allowed to read the

deposition of the defendant's former expert witness because the plaintiff had made

no attempt to contact the witness or offer his usual expert fee for appearance at

trial.  In <u>Niver v. Travelers Indem. Co.</u>, 430 F. Supp. 2d 852, 866 (N.D. Iowa

2006), the court denied the plaintiff's pretrial request to present deposition

testimony where the defendant represented that the witnesses would appear live at

trial, despite the fact that they lived more than 100 miles away from the courthouse.

But in this case, of course, Upchurch did not object to the Lumpkin deposition's being read, and he even counter-designated portions to be read in the plaintiff's case. Upchurch did not tell Judge Noce that Lumpkin was going to appear live later in the case. At the time the deposition was read, McGowan had not yet had his conversation with Lumpkin where Lumpkin got "squirrely," so as far as the defense team knew, Lumpkin was still intending to testify. Thus, if this had been all there was, there certainly would not have been any misconduct in Synergetics' statement that the witness was unavailable. Synergetics was not under any obligation to serve Lumpkin with a subpoena when he appeared in town for the mediation. Such a requirement would have a detrimental effect on parties' willingness to mediate cases, and in some circumstances it could be considered misconduct to "lure" a witness into the jurisdiction for the purpose of serving a subpoena.

However, as the case developed, Lumpkin ended up being unavailable for trial (and unwilling to appear) because of Scheller's wrongful conduct in agreeing to drop its claims against him if he would agree not to testify. So Synergetics, who was the proponent of the evidence because it was the one who wanted to read

the deposition in its case, was the one who had actually procured Lumpkin's unavailability. Under both Rule 32, Fed. R. Civ. P., and Rule 804, Fed. R. Evid., this means that Synergetics should not have been allowed to read Lumpkin's deposition testimony. Synergetics both procured Lumpkin's unavailability for trial and then concealed that it had done so. Under these circumstances, its reading from the deposition on the basis that he was "unavailable" was improper.

4. <u>Were defendants deprived of a full and fair opportunity to present their case?</u>

Defendants allege that they were deprived of a full and fair opportunity to present their case to the jury without Lumpkin's live testimony at trial. As an initial matter, the parties disagree about whether Synergetics must show that the outcome of the case would have been different had Lumpkin testified.

The Eighth Circuit has frequently stated that a party seeking Rule 60(b)(3) relief must show by clear and convincing evidence that fraud or misconduct prevented the movant from "fully and fairly presenting his case." <u>See</u>, <u>e.g.</u>, <u>United States v. Metropolitan St. Louis Sewer District</u>, 440 F.3d 930, 936 (8th Cir. 2006); <u>Miller v. Baker Implement Co.</u>, 439 F.3d 407, 414 (8th Cir. 2006). The Court has never explicitly determined whether the rule also requires the movant to show that the result would have been different absent the fraud, although it does require that

additional element under the "newly discovered evidence" ground in Rule 60(b)(2).  See Miller v. Baker, 439 F.3d at 414.  Synergetics points to cases in which Rule 60(b)(3) relief was denied and the Court noted that the result would not have been different even had the alleged misconduct not occurred, Atkinson v. Prudential Property Co., 43 F.3d 367,  373 (8th Cir. 1994), and E.F. Hutton & Co., Inc. v. Berns, 757 F.2d 215, 217 (8th Cir. 1985).  Neither Atkinson not Hutton can properly be read to require that Synergetics show that Lumpkin's testimony would have changed the outcome of the trial, because in each of those cases the Court found that the party had not been denied a full and fair opportunity to present its case.[12]

Other Circuits have explicitly held that result-altering prejudice is not required under Rule 60(b)(3), and I believe the Eighth Circuit would agree.  See Ty v. Softbelly's, 353 F.3d at 536; Schultz v. Butcher, 24 F.3d 626, 631 (4th Cir. 1994); Anderson v. Cryovac, Inc., 862 F.2d 910, 924 n.10 (1st Cir. 1988) (explaining that Rule 60(b)(3), unlike the "newly discovered evidence" standard of Rule 60(b)(2), does not require evidence to be result altering because it "focuses not on erroneous judgments as such, but on judgments which were unfairly

---

[12]In Atkinson the evidence supposedly withheld was in the possession of the moving party all along.  In Hutton the complaining party chose not to cross-examine the witnesses on the issue later complained about.

procured.").  Thus, whether Lumpkin's appearance would have changed the outcome of the trial is not dispositive.

Synergetics contends that Hurst and McGowan were not deprived of a full and fair opportunity to present their case for several reasons:  defendants have exaggerated Lumpkin's role, they were not really going to call him as a live witness and in fact did not actually try to call him, and they made a strategic decision to counter-designate portions of Lumpkin's deposition testimony to be read to the jury.  In support of this last argument, plaintiff relies on Mitzel v. Employers Ins. of Wausau, 878 F.2d 233, 235 (8th Cir. 1989), where the Eighth Circuit held that a party was not entitled to Rule 60 relief based on the inability to call a witness live at trial due to misrepresentations by counsel: "No prejudice is shown because the deposition of that witness was read into evidence."  Id.  While that might have been true in Mitzel, there is no blanket rule to that effect, and each case must be examined on its own facts.

Defense counsel Upchurch testified that Lumpkin was a key witness who would have testified that neither he nor Auld told Hurst and McGowan of Auld's copying.  He indicated that Lumpkin would also have testified that Synergetics was not careful with its trade secrets, because Auld was an officer of the company and he had given Lumpkin company information.   He also said that Lumpkin

would have testified, relative to unclean hands, that Synergetics had some disks from Infinitech that Scheller directed should be used to prepare Synergetics' drawings, although Upchurch admitted that Judge Noce had excluded this evidence.[13] Upchurch said Lumpkin would have testified to the steps Hurst and McGowan had taken while still employed, but he agreed that Lumpkin could not have testified about things he was not involved in, such as contacting customers and taking pricing information. A review of the trial transcript reveals that all of this testimony either was actually presented through deposition, or was not admissible in any event.

There is no doubt live testimony is almost always preferable to deposition testimony, especially where there is no video. There is also no doubt that Lumpkin was a key player in the relevant facts of this case. Certainly, Lumpkin could have testified about what he did in this case, and about the development of the drawings for the adapter. The portions of his depositions where he discussed how he designed and built the first prototype of the Innovatech adapter were read to the jury.

---

[13]Upchurch initially testified that Lumpkin would testify that Synergetics did not own the trade secrets it was claiming defendants had stolen. This was the argument he made to Judge Noce as well, but it is simply incorrect. The Infinitech drawings that Lumpkin claims Scheller handled improperly related to probes, and did not have anything to do with the adapter drawings, which is why Judge Noce excluded the evidence at trial.

The most important relevant testimony that Lumpkin could have given was that he did not know Auld was copying Synergetics' drawings, and that therefore Hurst and McGowan could not have known about the copying. Of course, Lumpkin's testimony about what Hurst or McGowan knew would not be admissible, but he could have testified that he himself did not know and that he did not tell defendants of Auld's copying. These parts of Lumpkin's deposition were actually read to the jury, as were the inconsistent and perjured parts of both of his depositions regarding Auld's participation in the drawings and McGowan's contacts with Auld.

Lumpkin did testify before me that neither he nor Hurst and McGowan knew of Auld's copying until after Auld's admission to Scheller, but I certainly did not believe him. I had the benefit, of course, of knowing not only about the two depositions full of perjury – which the jury also knew about – but also about Lumpkin's secretly recorded conversations where he boasted about learning how to manipulate and be creative in his deposition testimony, and described the process as a "game."[14] Upchurch testified that he believed Lumpkin would have been a very good witness, if he were properly rested. I conclude that Upchurch's

_____

[14]Both on the recording and at the hearing, Scheller agreed with the "game" comment – adding at the hearing that it was "more like Gladiator than Monopoly."

opinion is wishful thinking arising from the hindsight that all lawyers undoubtedly engage in when they have lost a major case.

From the evidence I cannot determine whether Upchurch would have actually called Lumpkin as a witness had he not "gotten squirrelly." Upchurch had not prepared a trial outline or spoken to Lumpkin in the week before trial. He had done no investigation into the Lumpkin lawsuit to see if there were things there that might be used to impeach Lumpkin. Upchurch had never even contacted Lumpkin's attorney. Upchurch testified that Lumpkin had been "incoherent" at the first deposition, which was the only time Upchurch had actually seen him testify. These things lead me to believe Upchurch might not have actually called Lumpkin to testify. On the other hand, Upchurch believed that Lumpkin would provide key testimony that could corroborate Hurst and McGowan's testimony that they did not know Auld was copying Synergetics' drawings, and that was undoubtedly an important issue. Upchurch knew that McGowan was in contact with Lumpkin and believed he could get him to trial, and Upchurch could have prepared for Lumpkin's testimony the night before calling him. These factors lend credence to his testimony that he would have called Lumpkin as a witness.

Although I believe Lumpkin would have been a very bad witness for the

defense, and although I believe that Synergetics' cross-examination of Lumpkin would most likely have shown him to be both untruthful and complicit in the theft of trade secrets, the fact remains that Hurst and McGowan did not have the opportunity to call him because Scheller induced him not to testify the day before trial. Had Upchurch known of Scheller's witness tampering, he could have used it very effectively before the jury, and could have argued that the tampering showed that Scheller believed that Synergetics' "case is weak or unfounded or that his claim is false or fraudulent." Great American Insurance Co. v. Horab, 309 F.2d at 264. See also Softbelly's, 353 F.3d at 534; McQueeny v. Wilmington Trust Co., 779 F.2d 916, 921-22 (3rd Cir. 1985) (discussing the inference as "one of the simplest in human experience"); Newark Stereotypers' Union v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3rd Cir. 1968) ("an attempt by a litigant to persuade a witness not to testify is properly admissible against him as an indication of his own belief that his claim is weak or unfounded or false.").

Although there is much conflicting evidence, Hurst and McGowan have shown clearly and convincingly that they were deprived of a full and fair opportunity to present their case. They wanted to call Lumpkin as a witness, he had been a key player in their business, and he had agreed for many months and through many conversations to testify at their trial. Although I believe that he

would not have helped their case, the fact that Scheller was so eager to keep him from testifying shows that a jury might have seen it differently. And the fact remains that Scheller induced him not to appear at trial after he had agreed to be there, and that is witness tampering.

### 5.     What is the appropriate remedy?

As set out above, Rule 60 allows the court to vacate the judgment; it does not allow the court to impose other affirmative relief. <u>Adduono</u>, 824 F.2d at 620. Rule 60 says that a court *may* relieve a party from a final judgment – it does not say that the court *must* do so. Whether to vacate a judgment under Rule 60 is discretionary. <u>Sellers v. Mineta</u>, 350 F.3d 706, 716 (8th Cir. 2003)(district court has wide discretion in ruling on a Rule 60(b) motion). Where the remedies allowed by the rules are not "up to the task" of remedying and sanctioning bad faith conduct occurring in litigation, the court can exercise its inherent powers to craft an appropriate order. <u>Chambers</u>, 501 U.S. at 50. I conclude that vacating the judgment and returning the case to the trial docket would not serve justice, and so I will impose a monetary sanction instead.

Hurst cheated Synergetics in all the ways found by the jury. McGowan cheated Synergetics in those same ways and then lied about it under oath. Lumpkin cheated, lied, secretly recorded conversations, and boasted about his

ability to manipulate the litigation process.  Scheller tampered with a witness,

made a deal he later claimed didn't exist, and treated the litigation process as a

game.

Another trial would not serve justice in this case.  The jury would have to be

told all of these confusing facts about the many changes in testimony and about

who knew what when in order to decide whom to believe.  Although all of these

things can be presented to a jury, doing so would lead to an extremely complicated

trial involving several different "mini-trials" on each of the credibility sub-issues.

Justice would also not be served by my vacating the judgment and

dismissing the claim against Hurst and McGowan and awarding attorneys' fees, as

defendants' motion for sanctions suggests.  That would reward Hurst and

McGowan for all of their wrongful conduct, and the evidence shows that they

were rightfully held liable to Synergetics.

But Synergetics must be punished for Scheller's wrongful conduct.  Witness

tampering is an extremely serious offense, and strikes at the heart of the litigation

process.  Our system of justice relies on witnesses coming to court and telling the

truth.  Interference with the process taints trials and threatens the integrity of the

justice system.  See Harlan v. Lewis, 982 F.2d at 1261.  The court has inherent

authority to sanction such conduct, and this is an appropriate case for sanctions.  I

have considered a variety of potential sanctions, but the only thing that makes any sense under these circumstances is a monetary sanction. It must be enough to punish Synergetics and show that courts cannot tolerate witness tampering, but it must not be so great that Hurst and McGowan are rewarded for their own bad behavior. I will order Synergetics to pay Hurst and McGowan jointly the sum of $1,172,776.66, which is one-half the total damages awarded, as a sanction.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to vacate judgment [#233] is denied, but the defendant's motion for sanctions [#290] is granted.

**IT IS FURTHER ORDERED** that plaintiff Synergetics, Inc. shall pay to defendants Charles Richard Hurst, Jr. and Michael McGowan the sum of $1,172,776.66 as a sanction for Synergetics' witness tampering.



_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 21st day of August, 2007.